UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DENISE G. BURGESS,

              Plaintiff,

     v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

Civil No. 3:13-cv-01593-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Denise G. Burgess ("Burgess"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 USC §§ 1381-1383f.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  For the reasons set forth below, that decision should be reversed and remanded for an award of benefits.

///

## ADMINISTRATIVE HISTORY

Burgess protectively filed for DIB and SSI on February 17, 2010, alleging a disability onset date of December 6, 2007. Tr. 20, 185-86.[1] Her applications were denied initially and on reconsideration. Tr. 106-07, 123-24. On September 28, 2011, a hearing was held before Administrative Law Judge Rudolph Murgo ("ALJ") at which Burgess, a medical expert ("ME"), and a Vocational Expert ("VE") testified. Tr. 35-75. The ALJ issued a decision on November 21, 2011, finding Burgess not disabled. Tr. 20-29. The Appeals Council denied a request for review on April 10, 2013. Tr. 1-5. Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court. 20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in 1961, Burgess was 50 years old at the time of the hearing. Tr. 28, 37. She has a GED and past relevant work experience as an adult caregiver and office clerk. Tr. 70-71. Burgess alleges that she is disabled based on seizure disorder, dysthymia, degenerative disc and joint disease, gastroesophageal reflux disease ("GERD"), and depression. Tr. 22, 203.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on January 21, 2014 (docket #12).

inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the

claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Burgess has not engaged in substantial gainful activity since December 6, 2007, the alleged onset date. Tr. 22. At step two, the ALJ found that Burgess has the severe impairments of dysthymia with degenerative disc disease of the spine and degenerative joint disease of the neck. *Id*. However, he found her seizure disorder, GERD, and depression to be non-severe. *Id*.

At step three, the ALJ concluded that Burgess does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 25. The ALJ found that Burgess has the RFC to perform less than the full range of light work, can lift and carry 10 pounds frequently, and 10-15 pounds occasionally, can cumulatively sit, stand and walk up to 6 hours in an 8-hour work day with normal breaks, can perform only occasional overhead reaching with the left arm, can occasionally climb stairs and ramps, but cannot climb ropes, ladders, or scaffolding, must avoid exposure to hazards such as working at unprotected heights or around heavy machinery with exposed moving parts, and can

perform simple, routine type work requiring no more than occasional interaction with the public.  Tr. 26.

Based upon the testimony of the VE, the ALJ determined at step four that Burgess's RFC precluded her from returning to her past jobs as an adult caregiver or dental office clerk.  Tr. 27.  However, at step five, the ALJ found that Burgess was not disabled because she could perform unskilled work as a small products assembler or an electronics worker. Tr. 28-29.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).

## FINDINGS

Burgess contends that the ALJ erred by improperly discrediting the testimony of her treating physician, Kristin M. Kocher, M.D., and formulating the RFC without including the limitations identified by Dr. Kocher.  In particular, Burgess challenges the ALJ's rejection

of Dr. Kocher's opinions as reflected in her assessment dated September 17, 2009 (Tr. 597-601) and endorsed in her follow-up letter dated September 27, 2011 (Tr. 596).

I.    **Dr. Kocher**

    A.    **Treatment Records**

The chart notes in the record reflect a treatment relationship between Burgess and Dr. Kocher dating to as early as February 2006 (Tr. 406-07), and a letter from Dr. Kocher states that she has been Burgess's treating physician since 2000.  Tr. 596.

As is not unusual for a primary care physician, many of Dr. Kocher's records reflect treatment for transitory or lifecycle issues largely unrelated to the impairments that form the basis for Burgess's disability claim.  Tr. 323-24 (hair loss), 326-27 (cyst and symptoms of menopause), 332-33 (bronchitis), 334-37 (pneumonia), 340-42 (smoking), 350-52 (sinusitis), 353-54 (bronchitis and wheezing), 368-69 (rib pain, possibly due to coughing causing fracture), 378-80 (annual exam and pap), 392-93 (thumb infection).  However, those records firmly establish Dr. Kocher's longstanding and broad-ranging treatment relationship with Burgess.

With respect to the impairments at issue here, Dr. Kocher evaluated Burgess's chronic neck and back pain in 2006 and first prescribed Vicodin (Tr. 406-07) and later added Methadone (Tr. 401).  She was also actively following Burgess's chronic GERD.  Tr. 399-402.  In June 2006, Burgess complained of "dizziness" when sitting or standing up too fast, as well as numbness in her right hand and two of her fingers.  Tr. 396.  Dr. Kocher ordered an MRI of the spine with follow-up.  Tr. 397.

Through 2006, Dr. Kocher continued to follow Burgess's degenerative neck issues, prescribing Vicodin and Soma (muscle relaxant).  Tr. 389-90, 394-95.  In December 2006,

Burgess complained of "vertigo for the last 3-4 days," but without other neurological symptoms.  Tr. 386-87.  Burgess also described nasal and ear pressure, prompting Dr. Kocher to prescribe an antihistamine (Meclizine) and provide a sample of a nasal spray (Rhinocort) (*id*), which Burgess reported had helped at her next appointment in mid-January 2007.  Tr. 384-85.  At that time, Burgess was treating her neck and back pain with a combination of muscle relaxants and narcotic pain medications (Soma and Amitriptyline at night, Naprosyn, and Vicodin) and felt somewhat better.  *Id*.

In June 2007, Burgess reported "feeling more down" which she attributed to her chronic pain.  Tr. 375.  Dr. Kocher discussed various options including medications, counseling, and stress relief, as well as various long-term narcotic options for relieving the pain associated with her degenerative joint disease.  Tr. 376.  She had been able to taper off some of her Vicodin usage by taking MS-Contin and was feeling much better.  Tr. 373.  However, the MS-Contin caused abdominal pain and by October 2007, Burgess had weaned herself off of the MS-Contin and was requesting a return to Vicodin for pain management.  Tr. 370.

On December 7, 2007, Burgess, who was then working part-time as an adult caregiver, received emergency treatment after losing consciousness on the job.  Tr. 303.  The following day, she experienced a "spell of feeling like she was going to pass out" and returned to the emergency room.  *Id*.  She underwent a neurological evaluation by Tracy E. Sax, M.D., who recommended an MRI of the brain, an electroencephalogram (EEG), and a thyroid test.  Tr. 303-05.  At that time, Burgess's medical providers felt she had a seizure disorder, but were uncertain of its etiology.  Tr. 300.  Burgess was prescribed Depakote and advised not to drive.  *Id*.

7 - FINDINGS AND RECOMMENDATION

The EEG proved abnormal and showed "phase reversal . . . in the left temporal region [which] could indicate a focal area of abnormality within the brain . . . or it could be a source for seizure activity."  Tr. 366.  Dr. Kocher assessed a "grand mal seizure" (Tr. 362) and continued to make that notation in chart notes over the ensuing 20 months.  Tr. 330, 347, 353, 357, 360 (chart entries through 10/27/09).  About nine months later in September 2008, Burgess complained of weakness and "seizures," but reported "no seizures since 12/07."  Tr. 357.  Due to problems with her Lyrica level, Dr. Kocher referred her to Dr. Sax for a possible change in medication.  *Id.*

On October 28, 2008, Dr. Sax again evaluated Burgess regarding her complaints of memory loss.  Tr. 279-80.  Dr. Sax noted the earlier EEG that was "mildly abnormal with occasional phase reversals."  Tr. 279.  Dr. Sax also noted the earlier "clinical suspicion for seizure but not clear evidence."  Tr. 280.  Dr. Sax recommended a repeat EEG and discontinuation of the prescription Lyrica due to side effects of "weight gain, depression, and possibly cognitive issues."  *Id*.  She also recommended neuropsychiatric testing to "distinguish an organic memory issue from psychiatric problems."  *Id*.  An EEG administered on November 3, 2008, proved normal.  Tr. 278.

In October 2009, Burgess continued to suffer from "spells" or "seizure like activity," consisting of incidents "where she is not communicating with any one [and] appears in a trance."  Tr. 329-30.  Dr. Kocher referred her back to Dr. Sax for follow-up.

Dr. Sax saw Burgess again on November 25, 2009.  Tr. 276-77.  Uncertain that Burgess had a seizure disorder," she recommended "EEG monitoring to document these episodes electronically."  Tr. 277.

In January 2010, Burgess underwent seven-day video EEG monitoring.  Tr. 272-75. That testing proved inconclusive "due to the lack of events during monitoring."  Tr. 274.

**B.  Opinions**

After participating in her care for nearly 10 years, Dr. Kocher completed an assessment form on September 17, 2009, opining that Burgess suffers from seizure disorder, chronic neck pain, degenerative joint disease, GERD, and depression.  Tr. 597.  Symptoms of those impairments include pain, fatigue, generalized seizures which include loss of consciousness, nausea, vomiting, and a depressed mood.  Tr. 597-98.  Dr. Kocher estimated that Burgess has moderately severe fatigue (8 on a scale of 0-10) and pain ranging from moderate (on a good day) to severe (on a bad day).  Tr. 598.

Dr. Kocher also found that Burgess would be able to lift or carry fewer than 10 pounds, could stand or walk no more than 30 minutes at a time, and could stand or walk no more than 2 hours in an 8-hour work day, and could sit no more than 4 hours in an 8-hour work day.  *Id*.  Dr. Kocher also opined that Burgess has marked limitations in concentration, persistence, or pace, moderate limitations in social functioning making her unable to be in stressful situations, and moderate limitations on her activities of daily living which interfered with her ability to perform house work, shopping, cooking, and paperwork. Tr. 599-600.  Dr. Kocher estimated Burgess would miss more than two (3+) days of work per month at even a simple, routine, and sedentary job due to the effects of her impairments and their related symptoms.  Tr. 600.  She also noted that stress worsened Burgess's depression and pain.  *Id*.

On September 27, 2011, Dr. Kocher wrote a letter stating that Burgess is still limited to the same degree as identified in the 2009 assessment and had been so limited since at least 2008.  Tr. 596.  Dr. Kocher also stated that:

> I have seen Ms. Burgess in the office many times in the last several years.  She often displays visible signs of depression and anxiety while in the office.  She also has severe pain and degenerative joint disease, and often has muscle weakness during my exams.  At times she has to use a wheelchair because of her weakness, and because of frequent falls.  Her seizures also cause her to fall at times.
>
> In the last few years, Ms. Burgess has also had memory loss. During our office visits, she often has trouble remembering what medications she takes, what events occurred in her recent life, and instructions I give her during our office visit.

*Id*.

### C.  Legal Standard

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a non-examining physician.  More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007) (citations omitted).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id*.  The "clear and convincing" standard "is the most demanding required in Social Security cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F3d 920, 924 (9th Cir 2002).  Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. *Tommasetti*, 533 F3d at 1040.

Even if a treating physician's opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632 (citations omitted). The opinion of a non-examining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark v. Barnhart*, 454 F3d 1063, 1067 n2 (9th Cir 2006). However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999) (citation omitted).

**D. ALJ's Reasons**

The ALJ gave "little weight" to Dr. Kocher's September 27, 2011 letter (Tr. 596) and the accompanying September 17, 2009 assessment (Tr. 597-601) because she "stepped outside of her general practitioner role into that of an advocate." Tr. 27. The ALJ also noted that it had been "some 18-months" between Dr. Kocher's visit with Burgess in March 2010 and her September 27, 2011 letter. *Id*. Finally, the ALJ asserted that "[r]ecent consultative examinations and testing simply do not support a true seizure disorder or diminished cognitive functioning to any measurable degree." *Id*. The ALJ did not identify the "consultative examinations and testing," but relied on the testimony of the ME (Miller Garrison, M.D.) and the "the objective clinical findings and medical opinions of Dr. Sax and evaluator Dr. Reiter" in formulating the RFC. *Id*.

**1. Role as an "Advocate"**

The Commissioner cites *Matney v. Sullivan*, 981 F2d 1016, 1020 (9th Cir 1992), as support for the proposition that an ALJ may reject the opinion of a doctor whom the ALJ reasonably finds to have assumed the role of an advocate. However, the doctor at issue in

*Matney* was not a treating doctor. Instead, he saw the claimant once and had "agreed to become an advocate and assist in presenting a meaningful petition for Social Security benefits." *Id.* In contrast, Dr. Kocher treated Burgess for nearly a decade and certified that her answers were based on her own "knowledge, treatment and observation" of Burgess and on her own "personal review of records from any other treatment providers." Tr. 601. The fact that Dr. Kocher completed a detailed form and follow-up letter on behalf of Burgess does not somehow transform her testimony from that of a treating doctor to be accorded special weight into that of an "advocate" which is somehow suspect. This reasoning provides no basis on which to discount the opinions of Dr. Kocher.

## 2. Seizure Disorder and Cognitive Impairment

The only other reason given by the ALJ for rejecting Dr. Kocher's assessment is his observation that "[r]ecent consultative examinations and testing simply do not support a true seizure disorder or diminished cognitive functioning to any measurable degree." Tr. 27. This is apparently a reference to the "electroencephalogram (EEG) testing from January 12, 2010 through January 18, 2010," which captured "[n]o epileptiform activity" (Tr. 24) and to the reports of James B. Powell, Psy.D., who conducted a consultative psychological evaluation on July 2, 2010 (Tr. 445-61), and Gregg F. Reiter, Ph.D., who conducted neuropsychological screenings in late January and early February 2011 (Tr. 526-29).

In rejecting the diagnosis of a seizure disorder, the ALJ relied on the testimony of the ME (Tr. 60-69), as well as the medical records from Dr. Sax, the neurologist who treated Burgess in December 2007 (Tr. 303-05) and again in October 2008 (Tr. 279-82), and from Dr. Reiter, a neuropsychologist, who evaluated Burgess in February 2009 and again in late January and early February 2011 (Tr. 526-29). The ALJ found that the ME's testimony and

the medical records from those providers "all reflect that there is no established etiology to support the claimant's alleged 'spells' and complained of memory deficits."  Tr. 24. However, the use of this reasoning to reject Dr. Kocher's opinions does not withstand closer scrutiny.  In particular, the ALJ took unwarranted liberties in interpreting the records and testimony, drawing conclusions which the providers never themselves drew.

The ALJ quoted a portion of a chart note of November 25, 2009, in which Dr. Sax states:  "I am not fully convinced that [Burgess] has a seizure disorder.  Since she states she has frequent spells, I would like to see if she could be approved for inpatient EEG monitoring to document these episodes electrically."[2]  Tr. 24, 277.  The EEG monitoring took place January 11-18, 2010, and was "[i]nconclusive . . . due to the lack of events during monitoring."  Tr. 479-80.  In a faulty leap of logic, the ALJ concluded:  "Results of the EEG monitoring *confirm the opinion of Dr. Sax that the claimant does not have a seizure disorder.*"  Tr. 24 (emphasis added).  Dr. Sax gave no such opinion.  It was error for the ALJ to conclude that "inconclusive" testing confirmed anything, much less that it provided a basis to infer what Dr. Sax would opine about a specific disorder that Dr. Sax never ruled out.

The ALJ took similar liberties with the testimony of the ME.  The ALJ did not simply reject the idea that Burgess has a seizure disorder and leave it at that.  Instead – based ostensibly on the testimony of the ME – the ALJ found that Burgess "has a somatoform anxiety-based disorder that is also severe."  Tr. 25.  The ME never testified that Burgess does not have a seizure disorder, nor did he testify conclusively that Burgess has a psychosomatic disorder.  With respect to the former, the ME repeatedly testified that

---

[2] The ALJ left off the last word of the sentence, "electrically."

Burgess has symptoms that suggest a seizure disorder.  *See* Tr. 67 ("there's a lot to indicate there's a seizure disorder") & 68 ("She's describing a lot of behaviors that sound very much like a seizure disorder.  Especially sounds like a seizure disorder to a neurologist").  He noted that her medical providers have "never been able to capture a seizure" during medical testing.  Tr. 60-61.  However, he flatly rejected the notion that the inability to document the seizures during in-hospital testing ruled out a seizure disorder.  Tr. 64.

As far as a psychosomatic disorder, the ME merely raised that as a possible alternative explanation for Burgess's many symptoms.  Tr. 61-62.  Overall, the ME felt that more information was needed "to get a clearer picture of what's happening" and to rule out a number of other possible diagnoses, including anxiety disorder, panic attacks, somatoform disorder, and obsessive compulsive disorder.  Tr. 65-66.  In contrast to the ALJ's conclusion that Burgess has a somatoform anxiety-based disorder, the ME testified that he was not in a position to rate the level of Burgess's functioning "assuming an anxiety disorder" and would be "reading between the lines" to even opine that she in fact has an anxiety disorder.  Tr. 68.  The ALJ placed his own diagnostic spin on the ME's testimony, using it both to reject Dr. Kocher's opinions and to conclude that Burgess should be diagnosed with a disorder that neither the ME nor any other medical provider ever endorsed.  This was an improper use of the ME's testimony and provides no basis on which to reject Dr. Kocher's opinions.

The ALJ also discounted the notion that Burgess suffered from the symptoms that she associated with her seizure disorder.  The medical records contain various entries in which Burgess reports various symptoms that she believes result from the seizure she suffered in December 2007 or from the "spells" that followed some months later.  Based on Burgess's ponderings, the ALJ tied her allegations of depression and cognitive deficits to

14 - FINDINGS AND RECOMMENDATION

her alleged seizure disorder and then found that rejection of the seizure disorder necessarily entailed rejection of Burgess's alleged depression and cognitive deficits.  After a lengthy recounting of the consultative psychological evaluation by Dr. Powell on July 2, 2010 (Tr. 23) and the neuropsychological evaluation by Dr. Reiter in early 2011 (Tr. 24), the ALJ found Burgess's "alleged impairments of depression with cognitive deficits from an alleged seizure disorder non-severe."  Tr. 24.  To support his conclusion that Burgess does not suffer from memory loss, the ALJ cited Dr. Reiter's evaluation in early 2011 which noted "no evidence of intellectual or cognitive deterioration."  Tr. 24, 529.  However, Dr. Reiter also noted that both her 2009 and 2011 MMPI-2 profiles "demonstrate characteristics of depression and anxiety.  In fact, her current profile would suggest that she is perhaps somewhat more tense and anxious now than she was previously."  Tr. 528.

Overall, the ALJ's analysis relies on an improper premise, namely that the inability to identify the cause of a claimant's symptoms is a sufficient basis on which to reject both the claimant's testimony concerning her symptoms and a treating physician's opinion about the limitations those symptoms impose.  Thus, the ALJ erred by failing to provide specific and legitimate reasons to reject the opinions expressed by Dr. Kocher.

## II.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000).  The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r of Soc.*

*Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).  The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act.  *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id*.  The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision.  *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991).  The reviewing court declines to credit testimony when "an outstanding issue" remains.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting the opinions expressed in Dr. Kocher's two submissions.  The ALJ rejected Dr. Kocher's opinion that Burgess has severe memory and emotional problems secondary to a severe seizure disorder, but failed to give adequate reasons to reject any such opinion by Dr. Kocher.  The ALJ does not discuss, much less give reasons for rejecting, the multitude of other limitations endorsed by Dr. Kocher.  Thus, Dr. Kocher's opinions should be credited as true.  *See Harman*, 211 F3d at 1179; *Smolen v. Chater*, 80 F3d 1273, 1281-83 (9th Cir 1996).

Turning to the other two facets of the *Harman* inquiry, this court finds no outstanding issues that need to be resolved before a determination of disability can be made,

16 - FINDINGS AND RECOMMENDATION

and that the record is clear that the ALJ would be required to find Kocher disabled if Dr. Kocher's opinions are credited.

At step five, based on the testimony of a VE, the ALJ determined that Burgess could perform jobs that exist in significant numbers in the national economy.  However, the VE testified that if a person is absent from work two or more days a month, she is not competitively employable.  Tr. 73.  Dr. Kocher opined that Burgess would miss three or more days per month from even a simple, routine, sedentary job due to her impairments, symptoms, medications, and their side effects.  Tr. 600.  Thus, when properly credited and combined with the VE's testimony, the testimony of Dr. Kocher establishes that Burgess is not capable of competitive employment.  Accordingly, this case should be remanded for an award of benefits.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be REVERSED AND REMANDED pursuant to sentence four of 42 USC § 405(g) for an award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, October 27, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

///

17 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED October 8, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge